UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| M. HILDA WILSON, | ) |
|       Plaintiff | ) |
| v. | ) Civil Action No. 2:09-cv-544-DBH |
| JOHN A. BODNAR, UBS FINANCIAL SERVICES, INC. and MORGAN STANLEY & CO., INC. | ) |
|       Defendants | ) |

**PLAINTIFF'S OPPOSITION TO
DEFENDANT UBS' MOTION TO DISMISS OF MARCH 31, 2010**

Now Comes the Plaintiff, Hilda Wilson, by and through counsel, Peter Clifford of Hodsdon & Clifford, LLC, and opposes Defendant UBS' Motion to Dismiss, dated March 31, 2010, as follows. A related Motion to Dismiss of March 31, 2010, of Defendant Morgan Stanley & Co., Inc., has also been filed. For ease of reference, both Motions are addressed in this Memo. Morgan Stanley's Opposition simply adopts this Memo by reference.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

In this case, the Amended Complaint is sufficiently detailed to survive the Motion to Dismiss of UBS, and the related Motion of Morgan Stanley.[1] Previously the Court refused to grant a similar Motion to Dismiss filed before the Complaint was amended. After Amendment, the court declared the Motions to Dismiss moot.

Plaintiff's previous opposition included the affidavits of M. Hilda Wilson and Michael O'Keefe. Those affidavits and prior opposition are incorporated by reference into this opposition, and set forth the details of the claim. Additionally, the facts set forth in the affidavits

---

[1] The Motions of Defendants are very similar, with the exception that the arguments of UBS include a demand that the case be dismissed because of its arbitration.

have been incorporated into the 117-paragraph Amended Complaint, and the attachments to the Complaint. These sources provide allegations of fraud, fraudulent concealment and other misconduct sufficient to survive the Motions to Dismiss. The allegations are pleaded with particularity, and include a detailed review of all of the transactions at issue dating back to 1989.

The First Amended Complaint asserts that the Plaintiff is an 86 year old widow. First Amended Complaint ¶ 1. At all material times, Mr. Bodnar and the other Defendants were her longtime financial advisors and fiduciaries. *Id.* ¶¶ 2-5. The Complaint alleges that the Plaintiff was unsophisticated, uneducated in financial matters, and "relied completely" on Defendants. *Id.* ¶ 10. It asserts that Defendants fraudulently concealed their wrongful conduct until 2007. *Id.* ¶¶ 6, 9. A host of detailed, allegedly improper transactions are painstakingly set forth at ¶¶ 15-44.

According to Exhibit 1 of Mr. O'Keefe's Affidavit, on February 6, 2006, Ms. Wilson's counsel suggested that if a settlement could not be worked out, he was likely to demand arbitration. *Id.* Ex. 6, p. 2. Thereafter, he demanded a copy of the arbitration agreement on March 6, 2006. *Id.*, Ex. 7. On October 4, 2006, UBS rejected the claim, but ignored the request for information about arbitration, and did not include the requested forms. First Amended Complaint, Ex. 1, p. 8.

The arbitration "agreement" was not produced until March 25, 2010, after Defendants' first Motion to Dismiss was rejected well after the due date for the Answer to the First Amended Complaint, initially set by the Court for the motion to amend.[2]

Upon filing of the instant state court lawsuit, UBS failed to raise arbitration in the state court proceeding. Instead of immediately seeking arbitration, it sought removal to this court. Thereafter, it filed a lengthy and complex motion to dismiss, but once again failed to raise an arbitration issue. Finally, the repeated and longstanding failure to respond to the 2004-2006 requests for arbitration

---

[2] This due date was extended only after the request of defense counsel. According to her affidavit, the additional time was needed because of the press of business. She did not list the need to search for arbitration agreements.

information appears to have been a functional denial of the Plaintiff's demand for arbitration, and/or a waiver.

### Attorney Goldman's Declaration

As with the previous motion to dismiss, there are no affidavits from any named defendants, or from persons with personal knowledge of events. Instead, there is a very terse declaration from counsel.

The Goldman Declaration does not lay foundation for the alleged arbitration agreement, (which was described in a "continuing account" form, not a "new account" form). Defendants do not describe how the alleged arbitration agreement was discovered, whether it covers only one of Ms. Wilson's many accounts, or whether or when the account was ever closed.

On page 15 of UBS's Memo of law, Defendants assert a number of facts which are entirely unsupported by Mr. Goldman, or any witness. Defendants claim that:

(1) In February 1997, the plaintiff transferred existing brokerage accounts to UBS.

(2) In October 1999, Ms. Wilson converted one of her UBS brokerage accounts to an "InsightOne" account (a fee in lieu of commission account).

(3) When she did so, she signed an agreement with an arbitration clause.

(4) UBS asserts in footnote 12, without any support or explanation, that "Plaintiff signed account agreements with Paine Webber in 1997 that also contained mandatory arbitration clauses."

(5) The language of the arbitration agreement purports to expand mandatory arbitration to any and all controversies between "you" and "me" [Paine Webber].

Defendants do not allege that Ms. Wilson ever signed an arbitration agreement with any of the existing parties to the litigation. They have not provided any proof of consent that Ms. Wilson

3

consented to the assignment of any arbitration rights to UBS. The issue of UBS's right to enforce the agreement is simply not addressed by Defendants.

Mr. Goldman and Ms. Swift do not explain why an alleged agreement was not produced in the previous motion to dismiss, or whether it is an admissible business record. Mr. Goldman does not provide any basis for determining the alleged agreement's complete contents, its authenticity, validity or reliability. His declaration is not based on **any** personal knowledge relating to the misconduct alleged. It merely attempts to introduce a computerized employment history document for Mr. Bodnar, from the "Central Registry Depository," a part of the FINRA website, and the arbitration agreement. Mr. Bodnar, the Defendant with knowledge, has chosen to remain silent at this phase of the proceedings.

## SUMMARY OF ARGUMENT

There is very little practical difference between the previous Motion to Dismiss, dismissed as moot, and the renewed Motions to Dismiss, other than the suggestion that Defendants recently "found" a portion of a New Account Agreement dated October 13, 1999, pertaining to one of Ms. Wilson's many accounts, allegedly compelling arbitration. Defendants have not attempted to lay a foundation for the admissibility of this document, its applicability to UBS or Bodnar, through assignment, consent, or otherwise, or to attest to its reliability, validity or authenticity. This issue was not raised in the previous Motion to Dismiss and has been waived. Moreover, the circumstances under which this agreement has surfaced have not been explored.[3] Since the arbitration issue is the only new argument, most of this response will focus on it.

---

[3] The Defendants' Request for an Enlargement of Time to file the Answer did not include any suggestion that Defendants were looking for arbitration forms, and accordingly, the request was not objected to. The Defendants' counsel indicated that the enlargement was needed purely because of the press of business.

4

As argued previously, the Complaint and the Affidavits of Mr. O'Keefe and Plaintiff indicate that Defendants served as fiduciaries, employed fraud during the entire relationship with Plaintiff, and used fraud to conceal their actions. As a result, 14 M.R.S.A. § 859, not § 752, is the applicable statute of limitations, and this case must proceed forward.

## ARGUMENT

**1.  Applicable Legal Standards**

The applicable standard of review on a motion to dismiss is highly deferential to the plaintiff. The Court "must accept as true all the factual allegations in the complaint." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Goodman v. President & Trs. of Bowdoin College*, 135 F. Supp. 2d 40, 43 (D. Me. 2001). With respect to Rule 9's requirement to plead fraud with particularity, Plaintiff need only plead "the time, place, and content of the representations" alleged to be fraudulent, such that Defendants have notice of the alleged actions that form the basis of Plaintiff's claims. *See id.* at 59. Although "possibly relevant" to Plaintiff's claims, the Goldman Affidavit submitted by Defendants, setting forth the "FINRA" Employment History of Mr. Bodnar, should not be considered in the Motion to Dismiss. It is not "so integrated into or central" to Plaintiff's Complaint as to be incorporated by reference. *See id.* at 47.

**2.  Defendants have not met their burden of showing that they currently have a right to arbitrate this dispute under state contract law.**

Although federal policy favors arbitration, the court must first determine whether parties to a contract actually agreed to arbitrate. *See Graham v. Smith*, 292 F. Supp. 2d 153, 156 (D. Me. 2003), citing *Intergen v. Grina*, 344 F.3d 134, 142-43 (1st Cir. 2003) ("It is bedrock that arbitration is a matter of contract and that a party cannot be required to submit to arbitration any dispute which he has not agreed so to commit.") (internal quotations omitted). The arbitration agreement, in turn, is a matter of state contract law, requiring that district courts apply ordinary state-law principles that

govern formation of contracts.  *Graham*, 292 F. Supp. at 156, citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Maine requires clear contractual language, evidencing an intent to be bound to arbitrate.  *Me. Cent. R.R. v. Bangor & Aroostook R.R.*, 395 A.2d 1107, 1116 (Me. 1978).  The question of arbitrability is for the court.  *Graham*, 292 F. Supp. at 156 n.3.

The district court must apply state-law principles governing contracts when analyzing the contract issues, and federal substantive law thereafter when analyzing arbitrability.  *See Nicholas A. Califano, M.D., Inc. v. Shearson Lehman Bros., Inc.*, 690 F. Supp. 1354, 1354 (S.D.N.Y. 1988) (ordinary contract principles do not allow an arbitration clause covering personal account to be extended to cover a corporate account); *see generally* Michael A. Rosenhouse, J.D., *Application of Equitable Estoppel by Nonsignatory to Compel Arbitration—Federal Cases*, 39 A.L.R. Fed. 2d 17 (2009).

In this case, Defendants have not met their burden in the Motion to Dismiss of showing an enforceable contract to arbitrate.  There are many unanswered questions concerning the archived, barely legible form unearthed by the defendants, as evident from Exhibits 2 and 3 of Mr. Goldman's Declaration of March 31, 2010.  Much of the front of the document is illegible.  The checklist on the top of the form in Exhibit 2 indicates it is an "existing account," not a "new account."  The terms of the actual account agreement are unknown.  The date of acceptance is also unknown, and some of the signature lines appear to be blank.

Similarly, the "Certification, Acknowledgement and Signature" section, section D, on p. 1 of Goldman Exhibit 2, makes reference to terms of arbitration described in an accompanying "Account Agreement," a document that was not produced.  It is also unclear whether p. 2 of Goldman Exhibit 2

has any connection to p. 1 of that exhibit.  Page two starts with paragraph "7," but there does not appear to be any reference to paragraphs 1 through 6 anywhere on Goldman Exhibit 2.

The account at Paine Webber has presumably long since closed.  Alternatively, the arbitration agreement lapsed.  If so, the terms of the agreement were necessarily replaced by a new agreement, rendered moot, rescinded, or nullified by mutual agreement.  It is unknown whether the account in Goldman Exhibit 2 was ever assigned or transferred to UBS.  UBS and Bodnar are not parties to the agreement.  Goldman Exhibit 2 makes no mention of anyone else having the right to arbitrate other than "the parties."  *See generally Gruntal & Co., Inc. v. Steinberg*, 854 F. Supp. 324 (D.N.J. 1994), *affd*, *Gruntal & Co., Inc. v. Steinberg*, 46 F.3d 1116 (3d Cir. 1994) (a declaratory action could not be granted summarily because genuine issues of fact existed as to whether purchaser might be obligated to arbitrate as successor to or assignee of contract between customers and securities brokerage office).

In *Graham*, 292 F. Supp. 2d at 156, the court found that neither Graham nor Shane signed the subject arbitration documents in a personal capacity, and concluded that both had a "very strong case" that the agreements at issue did not bind them to arbitrate.  As with any contract to arbitrate, the burden is on the proponent of arbitration to show clear contractual language indicating an intent to arbitrate.  *Id.*

A related issue, the absence of mutuality of obligation, was previously addressed in *McCarthy v. Azure*, 22 F.3d 351 (1st Cir. 1994).  In that case, the First Circuit held that when a corporate officer signed an agreement containing an arbitration clause in his official capacity and thereafter sought to compel arbitration of claims lodged against him as individual, arbitration would not be compelled.  *Id.* at 363.  Although the purchase agreement contained an arbitration clause, it did not extend the right to compel arbitration to agents or employees of the corporate signatory, nor did it manifest an intention to confer third party beneficiary status on any such agents or employees.  *Id.* at 356-359.

*McCarthy* also rejected the third party beneficiary argument that Defendants raise on pp. 18-19 of UBS's second Motion to Dismiss:

> Appellant next posits that, as a third-party beneficiary of the Purchase Agreement's arbitration clause, he can compel plaintiff to arbitrate. This claim also fails.
>
> As is generally the case in matters of contract interpretation, "the crux in third-party beneficiary analysis . . . is the intent of the parties." Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, 795 F.2d 1111, 1117 (1st Cir. 1986). Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories, *see, e.g.*, Arlington Trust Co. v. Estate of Wood, 123 N.H. 765, 465 A.2d 917, 918 (N.H. 1993), a person aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him. *See* Mowbray, 795 F.2d at 1117; Arlington Trust, 465 A.2d at 918; Tamposi Assocs. v. Star Mkt. Co., 406 A.2d 132, 134 (N.H. 1979); *see generally* 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 10.3, at 22-23 (1990); 4 Arthur Corbin, *Contracts* § 776 (1951).
>
> In this instance, we are unable to discern any indication in the Purchase Agreement that the parties meant to make their respective agents or employees third-party beneficiaries. Neither Azure nor any other employee of Theta II is mentioned explicitly in the Purchase Agreement; there are no meaningful categorical references; the critical provision in the contract, *see supra* note 11, omits any mention of agents and employees; and we can find no principled basis for including Azure by necessary implication (especially since the contract contains an integration clause). These facts strongly militate against conferring third-party beneficiary status upon a corporate officer with respect to arbitration rights. *See* Shaffer v. Stratton Oakmont, Inc., 756 F. Supp. 365, 369 (N.D. Ill. 1991) (refusing to find a third-party beneficiary relationship generating an obligation to arbitrate in analogous circumstances); Lester v. Basner, 676 F. Supp. 481, 484-85 (S.D.N.Y. 1987) (refusing to find an obligation to arbitrate under a third-party beneficiary theory when the contract itself "is silent as to whether [its] terms" apply to the purported third-party beneficiaries).

*McCarthy*, 22 F.3d at 362; *accord Gruntal & Co., Inc.*, 854 F. Supp. 324.

Finally, the Affidavits of Ms. Wilson and Mr. O'Keefe make clear that Goldman Exhibit 2, allegedly signed by both parties on October 13, 1999, was the product of fraud and fraudulent

8

concealment, and thus unenforceable *ab initio*. Since the Affidavit and Complaint allege that Bodnar and the other defendants were actively concealing their fraud during this period and for years earlier, the agreement is unenforceable under state law. Maine courts do not enforce illegal contracts. *See Allstate Ins. Co. v. Elwell*, 513 A.2d 269, 272 (Me. 1986); *Lehigh v. Pittston Co.*, 456 A.2d 355, 361 (Me. 1983).

3. **By failing to raise the issue of arbitration previously, in their communications with Plaintiff, and in their prior Motion to Dismiss, and removing the action to this Court, Defendants have waived their right to compel arbitration.**

The determination of whether a party has waived its right to arbitration by engaging in "protracted litigation" is fact specific; "[f]actors to consider include: (1) the time elapsed from commencement of litigation to request for arbitration; (2) amount of any litigation (including exchanges of pleadings, any substantive motions, and discovery); and (3) proof of prejudice, including taking advantage of pre-trial discovery not available in arbitration, and expense." *PPG Indus., Inc. v. Webster Auto Parts Inc.,* 128 F.3d 103, 107-09 (2d Cir. 1997).

In the instant case, the correspondence attached to the affidavits of Ms. Wilson and Mr. O'Keefe indicates that the dispute was first raised with defendants on November 8, 2004. O'Keefe Aff., Ex. 1. According to O'Keefe Exhibit 1, on February 6, 2006, Ms. Wilson's counsel suggested that if a settlement could not be worked out, he was likely to demand arbitration. He demanded a copy of the arbitration agreement on March 6, 2006. On October 4, 2006, UBS rejected the claim, but said nothing about arbitration, and did not include forms. The forms were not produced until March 25, 2010, well after the due date for the Answer to the First Amended Complaint, initially set by the Court for the motion to amend. This due date was extended only after the request of defense counsel, purportedly due, according to her affidavit, solely to the press of business.

Upon filing of the state lawsuit, UBS failed to raise arbitration in the state court proceeding. Instead of seeking arbitration, it sought removal to this court. Thereafter, it filed a lengthy and complex motion to dismiss, once again failing to raise arbitration. Its failure to respond to the 2006 request for arbitration forms constitutes a denial of the demand for arbitration, and/or a waiver.

Under the *PPG Industries* test, there has been a waiver:

(1) The time elapsed from commencement of litigation to Plaintiff's request for arbitration is, depending on which letter is used, between **four years** and **six years**. Indeed, the statute of limitations issue raised by defendant would never have arisen if arbitration forms were produced when requested;

(2) The denial resulted in her spending thousands of dollars on attorneys' fees to research the legal claims, investigate it, and deal with three complex motions to dismiss in federal court. She has also been forced to hire economists EPR, at significant expense, to calculate damages, and to meet the Court's rigorous standards of proof for the admissibility of expert testimony. *See* First Amended Complaint, Ex. 2.

(3) The Plaintiff has also been prejudiced—Defendants elected to raise arbitration, and get a second bite at the apple, only after their first bite, the unsuccessful 12(b)(6) motion, failed. *See PPG Indus., Inc.*, 128 F.3d at 107-09. Had the motion succeeded, it is questionable whether the Plaintiff would have been informed of the existence of the arbitration language.

There is ample precedent supporting a finding of waiver on these facts. Waiver is a legal conclusion subject to plenary review, but finding of prejudice to the voluntary relinquishment of a known right, the non-moving party in support of a waiver is a question of fact subject to "clearly erroneous" standard of review. *Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1159 (5th Cir. 1986) (a party that initiated extensive discovery, answered twice, filed motions to dismiss and for summary judgment, filed and obtained two extensions of pre-trial deadlines, all without demanding arbitration, waived right to arbitration where district court's finding of prejudice to non-moving party was not clearly erroneous); *see generally S & R Co. Of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80 (2d Cir. 1998), *cert. dismissed*, 528 U.S. 1058 (1999) (the district court properly denied arbitration where it was not raised as a defense, the defendant participated in eighteen months of litigation including extensive discovery, and only raised arbitration in a motion for judgment on the pleadings

four months prior to trial); *Kelly v. Golden*, 352 F.3d 344 (8th Cir. 2003), *rehearing and rehearing en banc denied* (Jan. 21, 2004) (the district court did not err in ruling that a business partner waived his right to compel arbitration when he initiated a lawsuit against his partner, vigorously pursued discovery, and did not raise an arbitration claim until after the district court had ruled against him on all of his motions on the merits of the case); *Babitt v. Frum*, 606 F. Supp. 680 (S.D.N.Y. 1985) (a party may waive its right to arbitration by actively participating in a lawsuit in manner inconsistent with the right to arbitrate such that there is prejudice to the other party but filing of an action is not a waiver of the right to arbitrate before the defendant has answered on the merits); *Singer v. Dean Witter Reynolds, Inc.*, 614 F. Supp. 1141 (D. Mass. 1985) (the parties may waive their right to arbitration and present their dispute to court, and such waiver need not be express but may be inferred from the circumstances; the defendants waived their right to arbitration under the contract when they engaged in extensive discovery procedures for nearly one year before raising the issue of arbitration).

**4. If granted, an order compelling arbitration would violate Ms. Wilson's right to trial by jury.**

In this case, the pleadings assert that Ms. Wilson was an elderly unsophisticated widow, and that the Defendants breached their position of trust to enrich themselves, and fraudulently concealed their actions. Under such circumstances, Ms. Wilson's federal and state constitutional rights to trial by jury existed until she knowingly and voluntarily waived them in a valid, enforceable contract. *See McCarthy*, 22 F.3d at 355 (there is no waiver of the constitutional right to an Article III adjudication in the absence of assent); *Pacemaker Diag. Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 541 (9th Cir. 1984) (en banc) (recognizing that "the federal litigant has a personal right, subject to exceptions in certain classes of cases, to demand Article III adjudication of a civil suit"); *accord Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962). The statutory basis permitting contractual waiver of this constitutional right is found in 9 U.S.C. § 2.

In *Walker v. Ryan's Family Steak Houses, Inc.*, 289 F. Supp. 2d 916 (M.D. Tenn. 2003), *aff"'d*, 400 F.3d 370 (6th Cir. 2005), the court examined this issue. It found that there was strong evidence that plaintiffs could not be compelled to arbitrate their claims because they did not knowingly and voluntarily waive their constitutional right to jury trial. *Id.* at 383. The experience, background, and level of education of the Plaintiffs showed that they were unsophisticated. *Id.* at 381. Additionally, they had no time to consider the waiver provision in the agreement, and the option afforded them to contact a lawyer was an unrealistic opportunity. *Id.* at 381-82.

The same principles are true in the instant case. It would be manifestly unjust, given the allegations in the amended complaint and the supporting affidavits, to find a waiver of the constitutional right to jury trial.

5.   **Each Count of the First Amended Complaint states a valid cause of action.**

On pages 12-14 of UBS's most recent Motion to Dismiss, Defendants once again raise the 12(b)(6) issues raised earlier. The heart of their argument, set forth on page 12, is that fraud is not pleaded with particularity, as required by F. R. Civ. P. 9.

Defendants do not spend much time reviewing the 117 paragraphs of the First Amended Complaint, nor do they review the content of the lengthy and exhaustive letters and reports attached to the First Amended Complaint, Exhibits 1 and 2. They fail to analyze the "transactions" section of the Complaint at paragraphs 15-45, laid out for support. This argument is without merit. With respect to Rule 9's requirement to plead fraud with particularity, Plaintiff need only plead "the time, place, and content of the representations" alleged to be fraudulent, such that Defendants have notice of the alleged actions that form the basis of Plaintiff's claims. *See Goodman*, 135 F. Supp. 2d at 59.

The First Amended Complaint sets forth all the elements of churning. *See Xaphes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 632 F. Supp 471, 483 (D. Me. 1986). It plainly asserts that,

based on Plaintiff's age, the proper investment strategy should have been to hold quality income producing financial investments, not the more speculative products Defendants selected.  The strategy should have called for the client to hold the instruments for a significant amount of time, not to quickly buy and sell.  Plaintiff was not afforded opportunity to provide input.  Plaintiff should have been advised.  Additionally, Defendants breached their fiduciary duties by favoring their "own self interest over" Plaintiff, causing a loss "in excess of $1 million."

On page 13 of their most recent Motion to dismiss, Defendants examine the Maine Unfair Trade Practices Act (MUTPA), 5 M.R.S.A. §§ 206-214, and suggest that that act can never apply to transactions involving securities.  This contention is incorrect.  The First Circuit recently held that conduct is "exempt from [UTPA] only where it is subject to specific standards left to the enforcement of an administrative agency, not merely those circumstances in which the agency's scheme is 'extensive' or 'detailed.'"  *Good v. Altria Group, Inc.*, 501 F.3d 29, 58 (1st Cir. 2007); *see also Provencher v. T & M Mortg. Solutions, Inc.*, 2008 WL 2447472 at *7 (D. Me. June 18, 2008) (it is no longer appropriate, as in *Wyman  v. Prime Discount Sec.*, 819 F. Supp. 79, 86-87 (D. Me. 1993) (applicable to securities), and *Keatinge v. Biddle*, 2000 WL 761015 (D. Me. Mar. 20, 2000) (applicable to attorneys), for the MUTPA to apply to entire industries).  Where a consumer does not specifically cite the defendants for complying with a regulatory act, the defendants are not exempt from the act.  *See Good*, 501 F.3d at 58.  Consequently, Defendants' reliance on *Wyman* on page 13 is entirely misplaced.

The remainder of their argument on pages 13-14 amounts to an argument that Mr. Bodnar, was, at worst, guilty only of negligence, not fraud and fraudulent concealment.  This argument attempts to assert that Plaintiff has not "plausibly" pleaded that Bodnar "caused her any losses," or that Bodnar's advice was "inconsistent with her goals."  The argument overlooks a wide variety of

specific allegations of fraud and fraudulent concealment in the First Amended Complaint, and the detailed damages calculations in Exhibit 2. For this reason, Defendants' argument lacks merit.

**6.     The Complaint is not time barred. 14 M.R.S.A. § 859 sets forth the applicable limitations period.**

   a.     **14 M.R.S.A. § 859**

As a general rule, Maine's statute of limitations requires that most civil actions be brought within six years of the date a cause of action accrues. 14 M.R.S.A. § 752. An exception to this rule exists if the liable party used fraud to conceal their actions or to otherwise deceive the plaintiff. 14 M.R.S.A. § 859 states as follows:

> If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has a just cause of action, except as provided in section 3580. [Fraudulent Transfer Act, not applicable here.]

Thus, if fraud has been committed, or that has been used to conceal a cause of action, a civil action may be commenced within six years of *discovery* of the fraud. The issue of the time of discovery is a question of fact.

In order for a plaintiff to claim the benefit of 14 M.R.S.A. § 859, she must establish either: "(1) that defendants actively concealed material facts from her and that she relied on their acts and statements to her detriment; or (2) that a special relationship existed between the parties that imposed a duty to disclose the cause of action, and the failure of defendants to honor that duty." Harkness v. Fitzgerald, 1997 ME 207, ¶ 6, 701 A.2d 370, 372. Here, Plaintiff can do both.

The elements needed to establish fraudulent concealment under 14 M.R.S.A. § 859 are the making of (1) a false representation of a material fact with knowledge of its falsity or in reckless

14

disregard of whether it is true or false for the purposes of inducing another to act upon it, and (2) justifiable and detrimental reliance by the other. *Id.*, ¶ 7, 701 A.2d at 372.

Even when "the complaint alone" does not allege fraudulent concealment or fraud, a motion to dismiss must be denied if the plaintiff submits an affidavit setting forth facts sufficient to require the trial court to address "a minimum allegation of fraudulent concealment" under 14 M.R.S.A. §859. *Chiapetta v. Clark Associates*, 521 A.2d 697, 700 (Me.1987). Where the allegations in a complaint allowed the drawing of the reasonable inference that the plaintiff did not discover the cause of action, and could not have discovered it in the exercise of due diligence and ordinary prudence until a point in time within six years of the filing of the complaint, the action is timely under 14 M.R.S.A. §§ 752 & 859. *Capozza Tile Co. v. Joy*, 2001 U.S. Dist. LEXIS 14447 at *20-21 (D. Me. Sept. 13, 2001) ("Because the statute of limitations is an affirmative defense, a complaint will not be dismissed, pursuant to Rule 12(b)(6) as time-barred unless the complaint contains within its four corners allegations of sufficient facts to show the existence and applicability of the defense. Here, the allegations allow the drawing of the reasonable inference that the plaintiff did not discover the causes of action, and could not have discovered them . . . until a point fewer than six years before this action was brought.") (internal citations omitted); s*ee also Siegemund v. Shapland*, 247 F. Supp. 2d 1, 6-7 (D. Me. 2003) (a heir's allegations that the defendants fraudulently concealed the claims were sufficient to survive a motion to dismiss).

The Maine Law Court has frequently extended the statute of limitations in fiduciary relationship cases when, as here, the victims have relied on the representations and actions of their fiduciary, and were not in a position to understand that a cause of action had developed. *See, e.g., Anderson v. Neal*, 428 A.2d 1189, 1191 (Me. 1981) (the attorney-client relationship is a relationship of the "highest confidence"). In *Anderson*, the Law Court extended the limitation period in a legal

malpractice case, reasoning that that the plaintiffs were not in a position to discover negligent title work performed by their attorney. *Id.* at 1192. The Law Court held that the attorney's expertise, and the clients' required reliance upon the attorney, made the discovery of a judicially cognizable cause of action unlikely. *Id.* The Court stated that the reliance and trust placed with fiduciaries (such as attorneys) and a plaintiff's lack of means to discover injuries is akin to a fraudulently concealed cause of action. *Id.* The same rationale calls for denial of the Motion to Dismiss in this case.

Assuming *arguendo* that 14 M.R.S.A. § 859 does not apply, the cause of action accrues when the party suffers a "judicially cognizable injury." *Dunelawn Owners' Assn. v. Gendreau*, 2000 ME 94, ¶ 11, 750 A.2d 591, 595. Similarly, in a breach of contract case, the claim arises when a judicially cognizable injury first accrues. *See Kasu Corp. v. Blake, Hall & Sprague, Inc.*, 582 A.2d 978, 980 (Me. 1990). In this case, the fiduciary relationship between Plaintiff Wilson and Defendants extended into July 2007, less than six years before filing. Before that time, Defendant had no way of knowing she had been cheated.

In the present matter, the Complaint asserts that Plaintiff is an elderly, unsophisticated widow. It also asserts that Defendant Bodnar was a sophisticated stockbroker who agreed, with his firms, to manage Plaintiff's seven-figure fortune. The parties clearly had a fiduciary relationship, and Defendants do not argue otherwise. The Complaint asserts that the Plaintiff placed her "complete trust" in the Defendant, due to his expertise and the nature of the services he provided. As in *Anderson*, until the new broker (Mr. O'Keefe) did extensive research uncovering churning and self-dealing, the fraud was hidden, and intended to be hidden. Plaintiff had no way of knowing she had been swindled until Mr. O'Keefe and Mr. Clark told her the bad news, and until an economist thereafter calculated the damages.

      **b.**      **Continuing Violation Doctrine**

The continuing violation doctrine, frequently used in employment discrimination cases, holds that the statute of limitations can be extended in claims that would otherwise fall outside the limitations period, if they can be "linked to" acts within the appropriate time frame. *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 504 (D. Mass. 2008). In this case, as outlined above, the anchoring events were slowly uncovered only by the investigative work, over time, of Mr. O'Keefe and Mr. Clark.

### c.    Laches

In *Van Dam v. Spickler*, 2009 ME 36, ¶ 12, 968 A.2d 1040, 1044, the Maine Law Court examined the doctrine of laches:

> Laches will bar a claim of specific performance where "the omission to assert a right for an unreasonable and unexplained length of time ... has been prejudicial to an adverse party, [such that] it would be inequitable to enforce the right." *Northeast Harbor Golf Club, Inc. v. Harris,* 1999 ME 38, ¶ 19, 725 A.2d 1018, 1023 (quotation marks omitted). Additionally, "[a] party is as much open to the charge of laches for failure to prosecute a case diligently as for undue delay in its institution." *Kelley v. Bhd. of R.R. Trainmen,* 148 Me. 95, 99, 90 A.2d 717, 720 (1952) (quotation marks omitted). Whether the equitable doctrine of laches bars a claim is an issue of law that we review de novo. *Longley v. Knapp,* 1998 ME 142, ¶ 10, 713 A.2d 939, 943. However, we review a trial court's factual findings for clear error. *Estate of Martin,* 2008 ME 7, ¶ 18, 938 A.2d 812, 819.

In this case, the equitable doctrine of laches does not bar the Complaint. The elderly Plaintiff acted reasonably after the existence and extent of the self dealing was brought to her attention in 2005 through 2008. In 2005, Mr. O'Keefe reviewed the statements after long delays and foot dragging by Defendants. An economist was then hired to calculate damages in 2007. Thus, Ms. Wilson discovered the massive extent of the fraud only in late 2007, or early 2008. The equities favor Plaintiff over Defendants.

### 7.    The Goldman Declaration and its exhibits should not be considered.

The Goldman Declaration should not be considered as part of Defendant's Motion to Dismiss. When a document (whose authenticity is not challenged), "effectively merges into the pleadings[,] . . . the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998). For example, when a document has been "incorporated by reference" into the pleadings, a defendant may introduce the document in support of its motion to dismiss. *Fudge v. Penthouse Intl., Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988). In order for a document to be incorporated into the pleadings, the Court must find that the document was not merely referred to in the plaintiff's complaint but it was central to the claim. *Id.* A plaintiff's mere reference to a document or limited quotation from a document in a complaint does not render the document incorporated by reference. *See id.* (citing *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985)).

According to these standards, the Court may not consider the Goldman Declaration and exhibits. These documents are not central to Plaintiff's allegation that she has was defrauded by Defendants during the requisite period, or that Defendants fraudulently concealed their activity. Although possibly relevant, the documents are not so integrated into or central to as to be incorporated by reference into the pleadings. *See also Goodman*, 135 F. Supp. 2d at 46-47.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied. If necessary, leave to amend the Complaint should be granted, to address any potential Rule 9 problems.

Dated at Kennebunk, Maine, this 14th day of April, 2010.

      /s/ Peter Clifford
Peter Clifford
Hodsdon & Clifford, LLC
56 Portland Road
Kennebunk, Maine  04043
(207) 985-6184

**CERTIFICATE OF SERVICE**

      I certify that on this 14th day of April 2010, this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

          /s/   Peter Clifford
Peter Clifford
Hodsdon & Clifford, LLC
56 Portland Road
Kennebunk, Maine  04043
(207) 985-6184