*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *M. HILDA WILSON,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 09-544-P-H* |
| | ) | |
| *JOHN A. BODNAR, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

### RECOMMENDED DECISION ON MOTIONS TO DISMISS AND TO COMPEL ARBITRATION

The defendants, John A. Bodnar, UBS Financial Services Inc., and Morgan Stanley & Co. Incorporated, move to dismiss this action, removed to this court from the Maine Superior Court, York County. The action alleges fraud, violation of the Maine Unfair Trade Practices Act, breach of fiduciary duty and of contract, unjust enrichment, misrepresentation, conversion, and negligence. I recommend that one of the two motions be granted and that the other be granted in part.

### I.  Applicable Legal Standard

Both motions invoke Federal Rules of Civil Procedure 12(b)(6) and 9(b). Defendant Morgan Stanley & Co. Incorporated's Motion to Dismiss ("Morgan Stanley Motion") (Docket No. 23) at 1; Motion of Defendants UBS Financial Services, Inc. and John A. Bodnar to Dismiss or, in the Alternative, to Compel Arbitration ("UBS Motion") (Docket No. 24) at 1.  As the Supreme Court has clarified:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's obligation to provide the grounds of his

1

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Id*. "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

When fraud is alleged, the complaint must satisfy Fed. R. Civ. P. 9(b)'s requirement that it plead the circumstances "with particularity." The First Circuit directs that "[t]his degree of specificity is no more nor less than we have required in general fraud and securities fraud cases." *New Eng. Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987). A plaintiff must specify "the time, place, and content of an alleged false representation." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999).

## II. Factual Background

The currently-operative complaint includes the following relevant factual allegations.

The plaintiff is an 86-year-old resident of Kittery, Maine. First Amended Complaint ("Complaint") (Docket No. 16) ¶ 1. Defendant John A. Bodnar is a senior financial adviser currently employed by Merrill Lynch in Burlington, Vermont. *Id.* ¶ 2. At all relevant times, he

was employed by one of the two other defendants, UBS Financial Services Inc. and Morgan Stanley & Co., corporations that deal with investments and wealth management. *Id.* ¶¶ 2-4.

Bodnar began a business relationship with the plaintiff "in approximately 1989." *Id.* ¶ 5. The plaintiff sold a parcel of land in Kittery, Maine, in 1989 for a net gain of approximately $1.4 million, the bulk of which was invested with the defendants. *Id.* ¶ 13. At all material times, there has been a continuous fiduciary relationship of trust between the plaintiff and the defendants, which extended into July 2007. *Id.* ¶ 11. The plaintiff was unsophisticated and uneducated in financial matters and "relied completely" on the defendants." *Id.* ¶ 10. The defendants "committed to" continuing fraud on the plaintiff and fraudulently concealed their wrongful conduct from her. *Id.* ¶¶ 6-7. The plaintiff justifiably relied to her detriment on the false statements and misleading conduct of the defendants. *Id.* ¶ 8. She learned of the "massive scope" of the fraud on March 18, 2008. *Id.* ¶ 9.

On June 20, 1991, Bodnar purchased a two million dollar universal life insurance policy on the plaintiff's behalf. *Id.* ¶ 15. The plaintiff paid three consecutive annual premiums of $102,255.63 each on this policy. *Id.* ¶¶ 17, 19-20. The standard first-year commission that Bodnar would have received would have been 30-50% of the premium, plus possible expenses and bonuses. *Id.* ¶ 18. On or about May 1, 1994, the policy was changed to "reduced paid up" with a value of $329,502. *Id.* ¶¶ 21-22. The plaintiff lacked the necessary liquidity to purchase the policy and to make the three annual premium payments. *Id.* ¶¶ 22-23. She also did not possess a gross estate that would have necessitated a two million dollar life insurance policy. *Id.* ¶ 24.

In 1989, Bodnar purchased two annuities for the plaintiff in the amount of $200,000 each. *Id.* ¶ 25. Bodnar received a large commission from each purchase, and both were unreasonably

sold within two years of purchase and were subject to penalties. *Id*. ¶¶ 26-27. By 1997, Bodnar had purchased 20 different fixed and variable annuities for the plaintiff, 15 of which were held for less than three years, and only one of which was held long enough to exceed the penalty period. *Id*. ¶ 28. Each time an annuity was purchased, Bodnar received a commission. *Id*. ¶ 29. The plaintiff paid $29,201 in surrender charges for these annuities. *Id*. ¶ 30.

Between 1999 and 2001, Bodnar traded in 32 different mutual funds for the plaintiff, 12 of which were "B funds" that required the purchaser to pay fees if the security was not held for a certain period of time. *Id*. ¶¶ 31-32. Eighteen of the 32 mutual funds were held for less than two years, and 12 were traded within one year. *Id*. ¶ 33. Between 1989 and 2001, Bodnar made $1.3 million in mutual fund purchases and approximately $1 million in sales. *Id*. ¶ 34.

During 1996, and from 1998 through 2004, Bodnar traded in 24 separate equities and established 56 long equity positions with purchases totaling $919,612.62. *Id*. ¶ 35. Proceeds from the sale of these equities, net of commissions and SEC fees, were $900,947.14, resulting in a negative account value of ($18,665.48). *Id*. ¶ 36. Many of the equities purchased by Bodnar did not issue dividends. *Id*. ¶ 37. A majority of the equity positions taken by Bodnar were small in both monetary value and number of shares. *Id*. ¶ 38. The average holding period for these equities was 103 days, and the median holding period was 63 days. *Id*. ¶ 39.

At all material times, Bodnar was employed by defendants UBS and Morgan Stanley and was an agent "of both Morgan Stanley then UBS during the course of his respective employments with each company." *Id*. ¶¶ 42-43. His actions were implicitly and explicitly authorized by his principals. *Id*. ¶ 44.

The plaintiff is not a sophisticated investor. *Id*. ¶ 46. In November 2004, the plaintiff's attorney was assisting with her estate planning. *Id*. ¶ 47. At that time, he wrote to Bodnar to

request his financial records for the plaintiff's investments. *Id.* In 2005, while reviewing the statements, the attorney and a financial advisor noticed apparent frequent trading of stocks, life insurance policies, mutual funds, a great deal of annuity sales, and the exchange of some annuity contracts during surrender periods resulting in unnecessary financial penalties. *Id.* ¶ 48. Due to the number of transactions and the complexity of Bodnar's decisions, the plaintiff in 2007 hired an economist to calculate her damages. *Id.* ¶ 50. The economist reported that more than $1 million had been lost due to fraud and mismanagement and that there was a pattern of transactions that benefited Bodnar rather than the plaintiff. *Id.*

The defendants "fraudulently concealed their transactions with Plaintiff." *Id.* ¶ 51. From 1989 to 2007, Bodnar told the plaintiff to throw her financial paperwork away, visiting her two or three times a year and telling her that she was fine. *Id.* Until 2005, the plaintiff did not know that Bodnar received a commission of up to 30 – 50 % on the first of the life insurance premiums. *Id.* ¶ 53.[1]

The plaintiff kept the bulk of her assets with UBS until July 2007, when approximately $300,000 was transferred out. *Id.* ¶ 56. From 1989 to 1997, the defendants had complete control of the plaintiff's funds. *Id.* ¶ 58. The defendants knew that the plaintiff's investment objective was to be conservative in the handling of her estate, to preserve it for her future needs, and to protect her income. *Id.* ¶ 59. They knew that the plaintiff's experience in the area of securities investment was extremely limited, that she anticipated that the combined income from investment and her employment would provide her with sufficient funds on which to live, and that the funds available for investment represented essentially all of her life savings. *Id.* ¶ 63.

---

[1] The First Amended Complaint states that Bodnar received such a commission "on the first of the six annual $100,000 life insurance commissions." Complaint ¶ 53. I assume that the last word should be "premiums." It also appears that the six premiums pertain to the same policy discussed above for which three premiums were paid. Complaint ¶¶ 15-20.

They negligently, fraudulently, and unlawfully mismanaged her investments in an amount exceeding $1.25 million. *Id*. ¶¶ 59-60.

At the time the securities account was opened, the defendants persuaded the plaintiff to execute a Fiduciary Trading Authority, which gave them sole control and discretion over the management of the account. *Id*. ¶ 63. The defendants represented to the plaintiff that because of the size, internal organization, and research facilities available to them, the plaintiff could reasonably expect to achieve a substantial growth rate on the invested capital. *Id*. ¶ 64.[2] The defendants stated that Bodnar would personally supervise and manage the plaintiff's account so as to realize capital growth and investment return that would offer security for the original investment. *Id*. ¶ 64. The plaintiff opened and maintained accounts with the defendants in reliance on these statements and representations. *Id*. ¶ 65.

The defendants made the following representations that, in addition to their reputations, induced the plaintiff to enter into a series of securities transactions and to entrust the handling of her securities account to the defendants:

> The defendants would carefully manage the funds and securities deposited into their control by the plaintiff.
>
> The defendants would carefully analyze prospective investments and would only invest the plaintiff's funds in those companies providing income and offering long-term capital appreciation, in accord with her stated investment objective.
>
> The defendants would carefully monitor the market performance of each security purchased for the plaintiff's account, so that securities would be immediately liquidated in the event of a general market decline or in the event of a particular weakness of any individual security, so that the plaintiff's losses would be limited.

---

[2] This paragraph and several subsequent paragraphs of the First Amended Complaint allege that "Defendant brokers" engaged in the actions described. So far as I can tell, the First Amended Complaint names only one defendant broker, Bodnar. I have assumed, therefore, that these allegations are intended to be asserted against all of the named defendants.

> The plaintiff would be kept continuously advised with respect to the market performance and prospect of each security purchased for her account.

*Id*. ¶ 68. These representations were material and made with the intention that the plaintiff rely on them. *Id*. ¶ 69. The plaintiff reasonably relied on these representations, which were false, and the defendants either knew they were false or made them without reasonable grounds for believing them to be true, and with reckless disregard of their truth or falsity. *Id*.

Bodnar repeatedly misrepresented to the plaintiff that the defendants were able to render competent, unbiased, and professional investment advice and management and that they would not place their own interests above hers. *Id*. ¶ 71. The defendants' actions in the management of the plaintiff's account operated as a fraud and deception on the plaintiff. *Id*. ¶ 72. The defendants knew or should have known that this was being done and intentionally kept the plaintiff ignorant of the situation. *Id*. ¶ 73.

The defendants deceptively held themselves out to the general public and to the plaintiff as experts and fiduciaries in the purchase and sale of securities and the administration of securities accounts who would place clients' interests above their own. *Id*. ¶ 76. The defendants insisted that the plaintiff must place complete trust in them and give them complete discretion in purchasing and selling securities in order to realize the full benefit of their services. *Id*. ¶ 77. The plaintiff relied on these representations and gave the defendants complete control, authority, and discretion to manage her account. *Id* ¶ 78. The defendants administered the plaintiff's account in a fraudulent, deceptive, and unreasonable manner in direct contravention of their legal and ethical responsibilities. *Id*. ¶ 79. The defendants engaged in excessive trading, in securities that were unsuitable for the plaintiff's stated investment objectives and goals, and in a manner

unsuitable for the plaintiff. *Id*. ¶ 80. The defendant brokerages failed to supervise adequately Bodnar's activities and others who handled the plaintiff's account. *Id*.

A fiduciary relationship existed between the plaintiff and the defendants from 1989 to 2007. *Id*. ¶ 83. The defendants had significantly more knowledge and experience than the plaintiff in matters of finance, investment, wealth management, and wealth creation and knew that the plaintiff would be relying on them. *Id*. ¶ 85. The defendants breached a duty they owed to the plaintiff by making financial decisions that were against the plaintiff's best interest and by engaging in financial decisions that were aimed at generating fees and commissions. *Id*. ¶ 86.

Bodnar had control over the plaintiff's assets and possessed the authority and ability to make investment decisions on the plaintiff's behalf. *Id*. ¶ 90. The plaintiff had little to no involvement in Bodnar's investment decisions. *Id*. ¶ 91. Bodnar made investment decisions for the plaintiff out of self-interest and with careless disregard for the plaintiff's investment objectives. *Id*. ¶ 93. The volume of Bodnar's trading was excessive. *Id*. ¶ 94.

The defendants received large fees and commissions as a result of their management of the plaintiff's assets. *Id*. ¶ 97. The fees and commissions were a direct result of the defendants' breach of their fiduciary duty to the plaintiff. *Id*. ¶ 98. The defendants knew that this benefit had been unlawfully bestowed on them. *Id*. ¶ 99.

The plaintiff gave the defendants the bulk of her assets to manage based on promises that they made. *Id*. ¶ 102. As a result of the defendants' breach of contract, the plaintiff suffered damages. *Id*. ¶ 103.

The defendants owed a duty of care to the plaintiff. *Id*. ¶ 105. The defendants knowingly or negligently made false promises and or representations to the plaintiff. *Id*. ¶ 106. The

plaintiff reasonably relied on the misrepresentations to her detriment. *Id.* ¶ 107. The defendants negligently breached their duty of care to the plaintiff. *Id.* ¶ 116.

The plaintiff did not knowingly permit her funds to be taken from her account without her informed consent. *Id.* ¶ 111.[3] The defendants' conduct was motivated by greed and ill will toward the plaintiff and was so reckless and outrageous that malice toward the plaintiff is implied. *Id.* ¶ 113.

### III. Discussion

### A. Statute of Limitations

All of the defendants contend that the claims against them are barred by the applicable statute of limitations. Morgan Stanley Motion at 6-13; UBS Motion at 6-11. The plaintiff does not dispute that a six-year statute of limitations would ordinarily apply to her claims, all of which appear to arise under Maine law;[4] rather, she relies on the exception to that statute for fraudulent concealment. Plaintiff's Opposition to Defendant UBS' Motion to Dismiss of March 31, 2010 ("Opposition")[5] (Docket No. 25) at 14-17.

The statute cited by the plaintiff provides, in relevant part:

> If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action[.]

14 M.R.S.A. § 859. The plaintiff contends that the allegations of fraud and the existence of a fiduciary relationship are sufficient to bring this exception into play. Opposition at 14-16. In the

---

[3] The First Amended Complaint alleges that the "[d]efendants misrepresented Plaintiff's funds wrongfully, without giving proper notice to Plaintiff, and without obtaining informed consent." Complaint ¶ 112. This allegation is not intelligible.

[4] "All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards . . . except as otherwise specially provided." 14 M.R.S.A. § 752.

[5] The plaintiff intends this document to respond to both motions to dismiss. Plaintiff's Opposition to Defendant Morgan Stanley & Co., Inc[.]'s Motion to Dismiss of March 31, 2010 (Docket No. 26).

alternative, she contends that the continuing violation doctrine extends the statute of limitations in this case because "the anchoring events were slowly uncovered only by the investigative work, over time, of Mr. O'Keefe and Mr. Clark." *Id.* ¶ 16-17. The latter factual assertion is not one that may reasonably be inferred from the allegations of the amended complaint. Nor am I prepared to recommend that this court extend the continuing violation doctrine, which to date has been limited by the federal courts to use in employment discrimination and environmental cases, *see, e.g., Schaffhauser v. Citibank (S.D.) N.A.*, 340 Fed.Appx. 128, 131, 2009 WL 2400254 (3d Cir. 2009) at **2; *National Parks Conservation Ass'n v. Tennessee Valley Auth.*, 480 F.3d 410, 416-17 (6th Cir. 2007), to cases alleging state-law fraud, torts, and breach of contract.

The plaintiff's first and better-developed argument requires more consideration than does her second. She asserts, in the language of *Harkness v. FitzGerald*, 1997 ME 207, ¶ 6, 701 A.2d 370, 372, that the complaint alleges both that she did not discover the causes of action asserted in the complaint and could not have discovered them in the exercise of due diligence and ordinary prudence until a point in time within six years of the filing of the initial complaint. Opposition at 15. But, contrary to the circumstances of cases that she cites in support of this argument, she does not allege in the amended complaint that any of the defendants actually withheld the facts necessary to inform her of the existence of her causes of action. *See Siegemund v. Shapland*, 247 F.Supp.2d 1, 7 (D. Me. 2003) (allegations of breach of fiduciary duty by withholding information); *Capozza Tile Co. v. Joy*, No. 01-108-P-C, 2001 WL 1057682 (D. Me. Sept. 13, 2001), at *7, *aff'd* 223 F.Supp.2d 307 (D. Me. 2002) (allegations allow drawing of reasonable inference that plaintiff could not have discovered causes of action in exercise of due diligence

and ordinary prudence); *Anderson v. Neal*, 428 A.2d 1189, 1192 (Me. 1981) (no allegation of fraudulent concealment).[6]

Nor can the amended complaint reasonably be interpreted to allege that the plaintiff exercised due diligence with respect to her investments, a necessary element of the fraudulent concealment exception to the statute of limitations. *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996); *Kobritz v. Severance*, 2007 ME 3, ¶13, 912 A.2d 1237, 1241.

These pleading deficits require, at a minimum, that Morgan Stanley's motion to dismiss be granted. While the amended complaint avoids acknowledging the fact that Bodnar has not worked for Morgan Stanley (specifically, its corporate predecessor, Dean Witter Reynolds; Morgan Stanley Motion at 2) since 1997, Financial Industry Regulatory Authority (FINRA) BrokerCheck Report for John Andrew Bodnar (Document 23-2, attached to Declaration of Jeff Goldman (Docket No. 23-1)), at 5, the fact is that the plaintiff cannot allege any damages were caused to her by Morgan Stanley after that date. The plaintiff argues that the court may not consider this fact because the declaration and the attached report have not been merged into the complaint or incorporated in it by reference. Opposition at 18. This argument ignores the fact that a court may take judicial notice of public documents in connection with a motion to dismiss. *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51 (1st Cir. 2008); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (motion to dismiss securities case). The FINRA Report, from all that appears, is a public document.

---

[6] The plaintiff also cites *Chiapetta v. Clark Assocs.*, 521 A.2d 697, 700 (Me. 1987), for the proposition that inadequate pleading of fraud or fraudulent concealment is insulated from dismissal if the plaintiff submits an affidavit setting forth facts sufficient to constitute "a minimum allegation of fraudulent concealment." Opposition at 15. This is an apparent reference to her affidavit, submitted in support of her opposition to the defendants' earlier motions to dismiss. Docket No. 11. Unfortunately, that affidavit suffers from the same factual deficiencies as the amended complaint.

I do not reach the same conclusion with respect to Bodnar or UBS, against whom timely allegations are made in the amended complaint. Nevertheless, they seek dismissal, UBS Motion at 6 n.10, of any claims based on events that took place more than six years before the initial complaint was filed, on September 22, 2009. Exhibit A-2 to Notice of Removal (Docket No. 1-2). The plaintiff does not suggest any reason, other than 14 M.R.S.A. § 859 and the continuing violation doctrine, why these allegations against UBS and Bodnar should not be dismissed as untimely. Under the circumstances, any allegations against these defendants that are based on events specifically alleged to have occurred before September 22, 2003, should be dismissed, for the reasons already discussed.

## B. Elements of the Claims

### 1. Fraud (Count 1)

My discussion of each of the specific claims alleged against defendants Bodnar and UBS will be limited to those based on the timely factual allegations.

Fraud claims must be pleaded with particularity. Fed. R. Civ. P. 9(b). The time, place, and content of the allegedly fraudulent acts must be specified. *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010). This is true of both federal and state-law claims involving fraud. *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009). Each defendant's role in the fraud must be particularized. *Konstantinakos v. FDIC*, 719 F. Supp. 35, 39 (D. Mass. 1989).

Bodnar and UBS contend that the plaintiff's fraud claim "is pleaded in summary form rather than with the specificity [that] Rule 9(b) requires." UBS Motion at 12. The plaintiff's response to this argument is glancing at best. Opposition at 12. Specifically, the defendants assert that the amended complaint does not suggest "how the Plaintiff instructed the Defendants

to invest her assets and how anything [they] did or said conflicted with those instructions." UBS Motion at 12. Count 1 appears to allege state common law fraud. The elements of such a claim under Maine law are a false representation of a material fact with knowledge of its falsity or in reckless disregard of whether it was true or false for the purpose of inducing the plaintiff to act or refrain from acting in reliance on the false representation and the plaintiff relied on the misrepresentation and acted on it to her detriment. *In re Adoption of Patricia S.*, 2009 ME 76, ¶ 22, 976 A.2d 966, 972. I do not see how the plaintiff's instructions to Bodnar or UBS and their compliance, or lack thereof, with those instructions, is relevant to any of the elements of a claim of fraud. Accordingly, I will not consider this allegation further.

Bodnar and UBS next assert that the amended complaint "fails to supply specific allegations of fact which strongly imply a fraudulent intent." UBS Motion at 12 (citation and internal punctuation omitted). Intent is an element of fraud. *Pelkey v. Norton*, 99 A.2d 918, 920 (Me. 1953). It is true, as Bodnar and UBS state, UBS Motion at 12, that some courts have held that a motive to earn money from fees and commissions does not create an inference of fraud, *see, e.g., Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007), but that is not all that the amended complaint alleges in this case. It alleges an intent to deceive the plaintiff and an intent that she rely on the deception to her detriment, Amended Complaint ¶¶ 71, 73-74, and that is sufficient under Maine law, albeit barely.

The next challenge to the pleading in Count 1 of the amended complaint raised by Bodnar and UBS is an assertion that the amended complaint "falls well short of setting out the details of any alleged misrepresentations by UBS or Mr. Bodnar." UBS Motion at 12-13. They refer to paragraphs 69 and 104-08 of the amended complaint in support of this argument. *Id*. at 12. But, those paragraphs are summary paragraphs, incorporating all other paragraphs of the

amended complaint and making allegations of law. The review of the amended complaint's allegations of misrepresentation accordingly cannot be so limited.

For example, paragraphs 64 and 68 list misrepresentations allegedly made by the defendants, while paragraphs 59, 62-63, 65, and 69 describe relevant circumstances surrounding the alleged misrepresentations. Bodnar and UBS do not specify any manner in which these allegations are legally insufficient. Bodnar and UBS have not established their entitlement to dismissal of Count 1 of the amended complaint, as limited to the post-September 22, 2003, period of time described above.

## 2. *Unfair Trade Practices Act (Count 2)*

Count 2 of the amended complaint alleges violation of the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A. Complaint ¶¶ 75-81. Bodnar and UBS contend that this statute does not apply to transactions involving securities. UBS Motion at 13. UBS and Bodnar respond that the opinion of this court so holding "is no longer appropriate." Opposition at 13.

Bodnar and UBS rely, Motion at 13, on *Wyman v. Prime Discount Secs.*, 819 F. Supp. 79 (D. Me. 1993), in which this court held that "Maine's regulatory exception, [5] M.R.S.A. § 208(1), operates to specifically exempt securities transactions from coverage under Maine's Unfair Practices Act." *Id*. at 87. The cited statute provided at that time: "Nothing in this chapter [the Unfair Trade Practices Act] shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the State or of the United States[.]" *Id*. at 86. I noted in my recommended decision in *Provencher v. T & M Mortgage Solutions, Inc.*, No. 08-31-P-H, 2008 WL 2447472 (D. Me. June 18, 2008), *adopted* July 24, 2008 (Docket No. 23), that applying section 208(1) to entire industries or

professions was no longer appropriate given the First Circuit's decision in *Good v. Altria Group, Inc.*, 501 F.3d 29 (1st Cir. 2007). 2008 WL 2447472 at *7.

That observation does not end the discussion for purposes of this case, however. In that case, the First Circuit merely held that section 208(1) applies to transactions and actions otherwise permitted, not to transactions and actions otherwise regulated. 501 F.3d at 58.[7] Bodnar and UBS make no attempt to demonstrate that the particular actions they are alleged by the amended complaint to have undertaken are otherwise permitted by federal or state law governing such actions or transactions. Accordingly, they are not entitled to dismissal of Count 2, to the extent that it is based on timely factual allegations.

### 3. Fiduciary Duty (Count 3)

The moving defendants do not address this count directly, and it is not clear whether they intend that it be included in their general assertion that "[t]he Plaintiff's additional claims are variations on the theory that the Defendants negligently handled the task of giving her financial advice." UBS Motion at 14. However, Count 3 alleges a breach of fiduciary duty by "making financial decisions that were against the Plaintiff's best interest." Complaint ¶ 86. That allegation cannot reasonably be read to include the giving of financial advice. Because the defendants' subsequent statement that "[v]arious additional infirmities in the pleading of the Plaintiff's negligence-based claims . . . are noted in the factual background section and footnotes thereto," UBS Motion at 14, might possibly be meant to include Count 3, I will consider the motion's sole specific reference to a fiduciary relationship.

That reference appears at pages 10-11 of the motion, in the section of the motion that discusses the issue of the applicable statute of limitations. Bodnar and UBS cite *J. Geils Band*

---

[7] This holding was not affected by the Supreme Court's affirmance in *Altria Group, Inc. v. Good*, 129 S.CT. 538 (2008).

for the proposition that summary judgment was upheld against "investors who alleged their dependence on a fiduciary relationship with their securities broker" because the investors had received documents that should have warned them about their finances. *Id*. at 10-11. This discussion says nothing, however, about the sufficiency of the allegations in Count 3; indeed, the argument, stressing that the plaintiff "did absolutely nothing" to investigate what the defendants were doing with her money, *id*. at 11, is an argument appropriate for support of a motion for summary judgment, not a motion to dismiss, as it depends on information not included in the allegations of the amended complaint. Contrary to the moving defendants' argument, the plaintiff need not plead in her complaint that "she lacked access to the information held sufficient to put even 'unsophisticated investors' on notice of their claims in *J. Geils Band*[,]" *id*., which was a case involving summary judgment, 76 F.3d at 1248.

Bodnar and UBS are not entitled to dismissal of Count 3 on the showing made.

### 4. Churning (Count 4)

Bodnar and UBS contend that "'[c]hurning is a species of fraud[,]" UBS Motion at 13, and that, therefore, the complaint must allege what instructions she gave to Bodnar and/or to UBS, on what dates, whether the instructions were oral or in writing, in addition to information on her investment objectives and experience, and the responses or assurances made by either or both of the defendants. *Id*. They cite a case from the Southern District of New York in support of this assertion. That case dealt with a claim under the federal Securities Exchange Act of 1934. *Heller v. L.F. Rothschild*, 631 F.Supp. 1422, 1423, 1424-25 (S.D.N.Y. 1986).

Of more direct relevance is this court's decision in *Xaphes v. Merrill Lynch, Lierce, Fenner & Smith*, 632 F. Supp. 471 (D. Me 1986), issued one day before *Heller*, in which, after trial, this court stated the elements of a churning claim under the federal act: "In order to recover

on his claim of churning, Plaintiff must prove that Defendants exercised control over the securities account, traded excessively in light of Plaintiff's stated objectives and the nature of his account, and acted with intent to defraud or with willful and reckless disregard for Plaintiff's interests." *Id*. at 483.

The plaintiff responds that the amended complaint "sets forth all the elements of churning" as follows:

> It plainly asserts that, based on Plaintiff's age, the proper investment strategy should have been to hold quality income producing financial investments, not the more speculative products Defendants selected. The strategy should have called for the client to hold the instruments for a significant amount of time, not to quickly buy and sell. Plaintiff was not afforded opportunity to provide input. Plaintiff should have been advised. Additionally, Defendants breached their fiduciary duties by favoring their "own self interest over" Plaintiff, causing a loss "in excess of $1 million."

Opposition at 12-13.

Whether *Xaphes* or *Heller* is used as the pleading standard, this summary of the amended complaint does not meet it. The plaintiff's summary of her allegations omits any reference to the plaintiff's "stated objectives" or instructions with respect to her investment; this is an element set forth in each case. *Xaphes*, 632 F. Supp. at 483; *Heller*, 631 F. Supp. at 1424. An investment strategy that should have been followed, however expansively interpreted, is not the same as stated objectives or instructions on the part of the investor.

However, the amended complaint does allege that the plaintiff had an investment objective that was known to the defendants. Complaint ¶ 59. This allegation does not meet all of the requirements of *Heller* but does appear to be minimally sufficient under *Xaphes*.

On the showing made, Bodnar and UBS are not entitled to dismissal of Count 4.

### 5. Unjust Enrichment (Count 5)

The moving parties again make no specific reference to this count.  In this instance, their general arguments do not include any statement that could reasonably be construed as a reference to this count.  They are not entitled to dismissal of Count 5.[8]

### 6. Breach of Contract (Count 6)

Bodnar and UBS say of this claim only that "the Plaintiff does not explain what terms of any contract UBS or Mr. Bodnar violated."  UBS Motion at 13.  The plaintiff does not address this count.  Count 6 of the amended complaint is cast in rather conclusory terms.  Complaint ¶¶ 101-03.  However, it does allege "promises" and consideration.  *Id.* ¶ 102.  It incorporates by reference all of the earlier paragraphs of the amended complaint, *id.* ¶ 101, several of which describe alleged promises by the defendants, *e.g., id.* ¶¶ 64, 68, 71.  No heightened pleading standard applies to breach-of-contract claims.  *See generally Provencher,* 2008 WL 2447472 at *16.

The moving defendants have not shown an entitlement to dismissal of Count 6.

### 7. Misrepresentation (Count 7)

Bodnar and UBS contend that the plaintiff's allegations of misrepresentation "fall[] well short of setting out the details of any alleged misrepresentations by UBS or Mr. Bodnar."  UBS Motion at 12.  I assume that Count 7 alleges negligent misrepresentation under Maine law, which is based on Section 552(1) of the Restatement of Torts: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to

---

[8] Bodnar and UBS contend that the plaintiff may not recover for any timely allegations, of whatever nature, because Exhibit 2 to the amended complaint shows no absolute losses in 2003 and 2004.  UBS Motion at 11-12.  But, the plaintiff may claim, and has claimed, that she would have made a greater profit in those years had the defendants not engaged in fraud, churning, and other elements of her claims.  That is a sufficiently pleaded claim for damages.

liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶13, 832 A.2d 771, 774 (citation and emphasis omitted). The single case cited by the moving defendants, *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 876, 878 (1st Cir. 1991), *partially superseded by statute on other grounds*, *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999), does not impose a heightened pleading standard on state-law negligent misrepresentation claims, and Maine law does not do so either. *Hayes v. Iworx, Inc.*, No. CV-06-168, 2006 WL 2959702 (Me. Super. July 31, 2006), at *4.

On the showing made, UBS and Bodnar are not entitled to dismissal of Count 7.

### 8. Conversion (Count 8)

Bodnar and UBS assert that the amended complaint does not allege the elements of a claim for conversion under Maine law. UBS Motion at 13-14. Again, the plaintiff does not respond to this argument. That alone would be reason to grant the motion as to this count. *Andrews v. Am. Red Cross Blood Servs.*, 251 F.Supp.2d 976, 979 (D. Me. 2003). In addition, the amended complaint is cast in terms so conclusory in this count that, even with a relaxed notice pleading standard, Count 8 is insufficient.

The elements of a claim for conversion under Maine law are:

> (1) a showing that there is a property interest by the person claiming the property was converted; (2) that person had a right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for a return, which was refused by the holder.

*Leighton v. Fleet Bank of Maine*, 634 A.2d 453, 457 (Me. 1993). There is nothing in the amended complaint that may reasonably be construed to allege that the plaintiff demanded the

return of any of her invested funds or that either of the moving defendants refused to comply with such a demand.

UBS and Bodnar are entitled to dismissal of Count 8.

### 9. Negligence (Count 9)

Count 9 alleges breach of unspecified duties of care by the defendants. Complaint ¶ 116. UBS and Bodnar do not address this claim separately, but rather contend that any claims that they "negligently handled the task of giving [the plaintiff] financial advice . . . are so inadequately and implausibly described in the Amended Complaint and its attachments . . . that it would be unfair as a matter of law to allow these claims to proceed any further." UBS Motion at 14.

The plaintiff characterizes this portion of the UBS motion as "amount[ing] to an argument that Mr. Bodnar[] was, at worst, guilty only of negligence, not fraud and fraudulent concealment." Opposition at 13. This assertion, of course, does not address the argument that the plaintiff has failed to plead a negligence claim sufficiently to state a claim upon which relief may be granted, and I might conclude that the plaintiff has waived any opposition to the motion to dismiss with respect to this count. Still, the complaint does provide sufficient allegations to state a claim in this count, and I believe that the court should exercise its discretion to deny the motion to dismiss this count for that reason. *See Pomerleau v. West Springfield Pub. Schs.*, 362 F.3d 143, 145 (1st Cir. 2004).

## C. Arbitration

Bodnar and UBS contend, in the alternative, that any claims asserted against them by the plaintiff are subject to mandatory arbitration. UBS Motion at 15-19. They rely on an account agreement signed by the plaintiff in 1997 with respect to "one of her UBS brokerage accounts"

by the terms of which she agreed "to arbitrate any controversies which may arise with [UBS's corporate predecessor]." UBS Motion at 15-16. The agreement is Exhibit 2 to the Declaration of Jeff Goldman (Docket No. 24-1).[9]

The Supreme Court has recognized the "fundamental principle that arbitration is a matter of contract" and that an agreement to arbitrate may be invalidated by generally applicable contract defenses. *Rent-A-Center, West, Inc. v. Jackson*, No. 09-497, 2010 WL 2471058 (S.Ct. June 21, 2010), at *3. Maine law also recognizes "a broad presumption in favor of arbitration." *Barrett v. McDonald Investments, Inc.*, 2005 ME 43, ¶ 15, 870 A.2d 146, 149.

The first of the plaintiff's myriad objections is that "[t]here are many unanswered questions concerning the archived, barely legible form unearthed by the defendants." Opposition at 6. However, she does not tie any of these questions to a reason to invalidate the agreement or to case law supporting such an outcome. Accordingly, I will devote no time to these questions.[10]

The plaintiff next asserts that "[t]he account at Paine Webber has presumably long since closed. Alternatively, the arbitration agreement lapsed." *Id.* at 7. However, she offers no evidence or argument to support these speculations. She goes on, "It is unknown whether the account in Goldman Exhibit 2 was ever assigned or transferred to UBS." *Id.* Even assuming

---

[9] The plaintiff contends that the court "may not consider the Goldman declaration and exhibits" because it does not meet the standards applicable for consideration of a document extraneous to the pleadings in connection with a motion to dismiss. Opposition at 17-18. I have already determined that Exhibit 2 to the declaration is a public document of which the court may take judicial notice for purposes of the motion to dismiss. With respect to the other exhibits attached to the Goldman declaration, which itself merely identifies and authenticates its attachments, those exhibits are clearly offered only in connection with UBS's motion in the alternative to compel arbitration and, as such, may be considered by the court. *E.g., Boulet v. Bangor Secs. Inc.*, 324 F.Supp.2d 120, 123-24 (D. Me. 2004).

[10] In their reply, UBS and Bodnar admit that the plaintiff "identified a discrepancy between the first and second pages of the copy [of a new account form] submitted." Reply Brief in Support of Motion of UBS Financial Services Inc. and John A[.] Bodnar to Dismiss the Amended Complaint or in the Alternative To Compel Arbitration ("Reply") (Docket No. 28) at 6 n.4. "[T]he arbitration clause submitted with the moving brief is not a part of the Plaintiff's 1999 new account agreement but of her 1997 new account agreement. The 1999 agreement had a nearly identical clause." *Id.* The plaintiff signed at least two new account agreements with arbitration clauses. Declaration of Fred DeMarco in Support of Defendants John A. Bodnar's and UBS Financial Services Inc.'s Motion in the Alternative to Compel Arbitration ("DeMarco Decl.") (Docket No. 28-1) ¶ 3.

that this observation is correct, Exhibit 2 is not the only agreement signed by the plaintiff that includes a mandatory arbitration clause. *See* DeMarco Decl. Exhs. A & B.

In addition, the plaintiff does not dispute that UBS is the corporate successor of PaineWebber. The defendant says only that "[i]t is a matter of public record that UBS is the successor to PaineWebber[,]" Reply at 6, without citation to authority.[11] UBS and PaineWebber merged on November 3, 2000. *See* http://en.wikipedia.org/wiki/Paine_Webber. As the defendants point out, Reply at 6-7, Maine law vests all contract rights possessed by each merging entity in the survivor entity. 13-C M.R.S.A. § 1107(1)(C). In addition, the new account agreements signed by the plaintiff provide that the agreements "shall inure to the benefit of [PaineWebber's] successors and assigns[.]" RMA Agreement, Exh. A to DeMarco Decl., ¶ 22; PaineWebber Insight One Account Agreement, Exh. C. to DeMarco Decl., at [5]. The amended complaint demonstrates the plaintiff's understanding of the relationship between UBS and PaineWebber, and she was clearly a customer of the latter at some point during the period from 1989 through 2007, covered by the allegations in the complaint, *see, e.g.*, Complaint ¶¶ 5, 9, 11, 28, 51, 58. UBS is a named defendant; PaineWebber is not.

Nothing in *Gruntal & Co. v. Steinberg*, 854 F. Supp. 324 (D.N.J. 1994), the only authority cited by the plaintiff on this point, Opposition at 7, would require a different result, even if it were binding authority in this court, which it is not. The plaintiff cites only generally to that opinion and provides no citation to a particular page or pages of the decision in support of her argument, but in that case the factual dispute at the summary judgment stage was whether the brokerage accounts at issue, which contained arbitration clauses in their accompanying contracts,

---

[11] The mere assertion by counsel of a material fact is insufficient in connection with a motion to compel arbitration, as it would be in connection with a motion for summary judgment. *Boulet*, 324 F.Supp.2d at 123-24 (both motions subject to same standard of review). Even for a "matter of public record," a citation to a specific public record is necessary.

had ever in fact been transferred to the plaintiff brokerage when it purchased the assets of the brokerage with whom the defendants had contracted. 854 F. Supp. at 335. Here, as noted, the plaintiff does not dispute that UBS is PaineWebber's corporate successor, and the transfer of the agreements was accomplished by merger; thus, there can be no question that UBS succeeded to whatever PaineWebber contracts did not expressly forbid such a transfer, and the agreements at issue expressly provided for it.

The plaintiff next argues that the arbitration clauses of these agreements cannot be invoked by Bodnar, because he did not sign them and they do not specify any mutuality of obligation running between him and the plaintiff. Opposition at 7-8. She cites as authority for these two propositions *Graham v. Smith*, 292 F.Supp.2d 153 (D. Me. 2003), and *McCarthy v. Azure*, 22 F.3d 351 (1st Cir. 1994).

In *Graham*, individual plaintiffs were attempting to enjoin arbitration proceedings to which they had been made individual parties, on the grounds that neither had signed the agreement containing the arbitration provision as individuals, and one had only signed it in his corporate capacity. 292 F.Supp.2d at 155-56. In applying the likelihood-of-success prong to weighing the plaintiffs' preliminary injunction claim, Judge Hornby of this court observed that these individuals "have a very strong case that neither of these agreements binds them individually to arbitrate," because Maine law requires "clear contractual language evidencing an intent to be bound to [arbitrate]." *Id*. at 156 (citation omitted). The most recent Maine court decision on this issue that I have been able to locate holds that agents or employees of parties to arbitration agreements who are not themselves formal parties to those agreements may invoke arbitration for claims that arise out of the agreements that include the arbitration clauses. *England v. Cantara*, No. CV-07-599, Maine Superior Court (Cumberland County), 2008

Me.Super.LEXIS 134, at *2, *4-*7. But, that opinion also acknowledges that First Circuit precedent is to the contrary, *id*. at *6, and this court is bound by that precedent.

In *Azure*, the First Circuit addressed under New Hampshire law an attempt by a corporate officer, who had not signed the agreement at issue that contained an arbitration clause, to invoke that clause for claims asserted against him individually. 22 F.3d at 353-54, 356. The court agreed that the failure of an individual to sign individually an agreement containing an arbitration clause "does not in and of itself settle the somewhat different question of whether he can invoke the arbitration clause contained therein." *Id*. at 356. In that situation, the arbitration provision will be extended to cover employees if the individual was sued as an employee and the court specifically finds that the parties intended the arbitration provision to cover employees. *Id*. at 357. The purchase agreement at issue in *Azure* was distinguished by the First Circuit precisely because it did not involve the handling of a securities account, which was the gravamen of most of the cases extending an arbitration provision to employees. Here, of course, it is the handling of a securities account that is at issue. This makes the case law cited by Bodnar and UBS, most of which was distinguished in *Azure*, quite applicable here. In addition, as the First Circuit noted, the language of the arbitration clauses at issue in the cases cited here by Bodnar and UBS was much broader than that in the agreement at issue in *Azure. Id*. at 358.[12]

I therefore conclude, as did the courts in, for example, *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1114, 1121-22 (3d Cir. 1993) (and cases cited therein); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993); and *Myrick v. GTE Main Street*

___

[12] There is also in this case some evidence, as UBS and Bodnar point out, Reply at 7, suggesting that the intent of the parties was that employees of PaineWebber and its corporate successor would be covered by the arbitration provisions. DeMarco Decl. ¶ 3, third bullet point, and Exh. C thereto at [6]: "Client agrees, and by carrying an account for Client PaineWebber agrees[,] that any and all controversies which may arise between PaineWebber, any of PaineWebber's employees or agent and Client concerning any account, transaction, dispute or the construction, performance or breach of this or any other agreement . . . shall be determined by arbitration." I do not rely on this evidence given the lack of evidence in the record demonstrating that this language actually appeared in any agreement signed by the plaintiff.

*Inc*, 73 F.Supp.2d 94, 96-97 (D. Mass. 1999) (and cases cited therein), that the arbitration clauses at issue in the securities brokerage agreements with PaineWebber signed by the plaintiff permit Bodnar to invoke arbitration of those claims asserted in this action that remain viable after the motion to dismiss has been determined.

Next, the plaintiff asserts that the agreements she signed with PaineWebber were "the product of fraud and fraudulent concealment, and thus unenforceable *ab initio*." Opposition at 8-9. Bodnar and UBS respond that this issue of contract validity is to be resolved by the arbitrator, not the courts. Reply at 7. The plaintiff does not contend that the arbitration clauses themselves were procured by fraud, but rather that the entire agreements were so obtained. Under these circumstances, Bodnar and UBS are correct. *See Prima Paint Corp. v. Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967); *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 53 (1st Cir. 2002); *Rent-A-Center*, 2010 WL 2471058 at *1.

Finally, the plaintiff contends that UBS and Bodnar have waived any right they may have to compel arbitration by removing this action from state to federal court without first raising the issue in state court and by failing to raise the issue in their first motion to dismiss this case in this court. Opposition at 9-11. In addition, she asserts, enforcing the arbitration clause would violate her constitutional right to a jury trial. *Id*. at 11-12.

It is true that a party may waive its right to compel arbitration by engaging in protracted litigation before seeking arbitration of the matter before a court. *Berenson v. National Fin. Servs. LLC*, 485 F.3d 35, 43 (1st Cir. 2007). Citing a list of factors set out in *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107-09 (2d Cir. 1997), the plaintiff contends that such a waiver has occurred here. Opposition at 9.

The first *PPG* factor is the time elapsed from the commencement of litigation to the request for arbitration. 128 F.3d at 107. The plaintiff contends that this period in the case at hand is "between four years and six years," Opposition at 10, based on the time between her first request for arbitration and the filing of the instant motion on March 31, 2010. The only date of such a demand mentioned in the factual section of the plaintiff's memorandum of law is a February 6, 2006 letter, Opposition at 2, supporting the four-year interval. The important point, however, is that the interval contemplated in *PPG* is not that between a party's first mention of arbitration and any party's formal post-court filing demand for arbitration; it is specifically the period between the commencement of the litigation and the making of the request. In this case, that interval is from September 22, 2009 (Docket No. 1-1 at 3) to March 31, 2010, approximately six months.

The plaintiff does not address the second factor, the amount of litigation, 128 F.2d at 107, directly. However, I consider her argument that waiver has resulted from the fact that these defendants did not seek arbitration in connection with their first motion to dismiss, filed on November 12, 2009 (Docket No. 7), to be based on this consideration. A party does not waive its right to compel arbitration by filing a motion to dismiss. *Creative Solutions Group, Inc. v. Pentzer Corp.*, 252 F.3d 28, 33 (1st Cir. 2001) (motion to dismiss followed by motion to compel arbitration did not substantially invoke litigation machinery; five months between filing of litigation and filing of motion to compel arbitration). The amount of litigation in this case has been minimal.

The plaintiff's showing as to the third and final *PPG* factor, prejudice to the opposing party, 128 F.3d at 107, is that she has incurred "thousands of dollars" of expenses on legal fees and expert witnesses. Such expenses are not enough to establish the necessary prejudice. *PPG*,

128 F.3d at 107 ("Incurring legal expenses inherent in litigation, without more, is insufficient evidence of prejudice to justify a finding of waiver."); *see also United Computer Sys., Inc. v. AT&T Corp.*, 298 F.3d 756, 765 (9th Cir. 2002).

UBS and Bodnar have not waived their contractual right to arbitration of the plaintiff's remaining claims.

UBS and Bodnar do not respond to the plaintiff's brief constitutional argument. She relies on the allegations in the amended complaint to the effect that she "was an elderly[13] unsophisticated widow, and that the Defendants breached their position of trust to enrich themselves, and fraudulently concealed their actions." Opposition at 11. This means, she asserts, that she did not "knowingly and voluntarily" waive her right to a jury trial on her claims "in a valid, enforceable contract." *Id.* If, as it appears, this is merely a restatement of the plaintiff's contention that the agreements which contain the arbitration clauses are unenforceable, I have already concluded that such a contention must be presented to the arbitrator.

If the plaintiff means to contend that she is entitled to a mini-trial, on demand, on the question whether her constitutional right to a jury trial was violated by an agreement to arbitrate future disputes, before an order compelling arbitration may be entered by the court, none of the case law she cites supports such a proposition. None of these cases even discusses a constitutional right in the context of an agreement to arbitrate. *See Azure*, 22 F.3d at 355 ("[A] person may, by contract, waive his or her right to adjudication[,]" citing *Pacemaker Diag. Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 541 (9th Cir. 1984). In *Pacemaker*, the Ninth

---

[13] The amended complaint asserts that the plaintiff was 86 years old in February 2010. Complaint ¶ 1 & at 16. This conflicts with the plaintiff's affidavit that gives her date of birth as October 6, 1922. Hilda Wilson's Affidavit in Support of Opposition to Defendants' Motion to Dismiss (Docket No. 11) ¶ 1. By either measure, when she began her "long-time business and fiduciary relationship" with Bodnar in 1989, Complaint ¶ 5, she was approximately 65-67 years old, not an age that is within the definition of "elderly" for many Americans. Also, by the terms of the amended complaint, any possible damage to the plaintiff at the hands of the defendants ended in 2007, when she was approximately 83-85 years old.

Circuit made the unexceptionable statement that "parties to a case or controversy in a federal forum are entitled to have the cause determined by Article III judges, with some significant exceptions yet to be fully delineated by the Supreme Court." 725 F.2d at 541. That language says nothing about the right to be in a federal forum in the first place, or about the requirements to establish a waiver of that right. In addition, I see nothing on the cited page of *Glidden Company v. Zdanok*, 370 U.S. 530, 536 (1962), that is at all applicable to the plaintiff's argument. In this instance, she gains nothing from this attempt to convert an issue of contract law into a constitutional question.

Nor does anything in *Walker v. Ryan's Family Steak Houses, Inc.*, 289 F.Supp.2d 916 (M.D. Tenn. 2003), the final case cited by the plaintiff, persuade me otherwise. It is not clear from the text of her brief whether the plaintiff means to cite the trial court's opinion or that of the reviewing Sixth Circuit in that case, Opposition at 12, but in any event the trial court in that case was presented with considerably more evidence[14] than the allegations of an unverified complaint, which is the only factual source cited by the plaintiff in this case. In the district court, the plaintiff-employees, who sought to avoid arbitration, filed a motion to rescind the arbitration agreement at issue. 289 F.Supp.2d at 918. No such motion has been filed here. There is no indication that the *Walker* trial court was made aware of the Supreme Court's *Prima Paint* case, which held that a claim of fraud in the inducement of the arbitration clause may be decided by the federal court, but not a claim of fraud in the inducement of the contract generally. 388 U.S. at 403-04. In any event, the First Circuit's decision in *Conseco*, which interpreted *Prima Paint*

---

[14] The plaintiff lists factual findings of one of the two *Walker* courts and then asserts that "[t]he same principles are true in the instant case." Opposition at 12. Perhaps the principles are the same, but the state of the factual record most certainly is not. Even considering the full content of the amended complaint and the "supporting affidavits," to which the plaintiff refers only generally, no showing has been made that the plaintiff was given "no time to consider" the arbitration provision, *id.*, and the court has only the plaintiff's own statement that she was "unsophisticated." Opposition at 11.

to hold that "a federal court must not remove from the arbitrator[] consideration of a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself," 292 F.3d at 53 (citation omitted), governs the instant case with respect to the question of the validity of the entire agreement of which the arbitration clause is a part.

### D.  Procedural Requests

Defendants UBS and Bodnar ask that all arbitrable claims be dismissed with prejudice. UBS Motion at 19.  I see no reason to make any dismissal of such claims with prejudice, and the moving parties proffer no authority for their request, merely citing case law that favors dismissal over retention of the case under a stay.

The plaintiff requests leave to amend her complaint a second time, should the motions to dismiss be granted, "to address any potential Rule 9 problems."  Opposition at 18.  I have not recommended dismissal of any count based on Rule 9, so this request appears to be moot.

### IV.  Conclusion

For the foregoing reasons, I recommend that the motion to dismiss of defendant Morgan Stanley (Docket No. 23) be **GRANTED**; that the motion to dismiss of defendants UBS Financial Services and John A. Bodnar be **GRANTED** as to any events that occurred before September 22, 2003, and as to Count 8 of the amended complaint and otherwise **DENIED;** and that the motion of defendants UBS and Bodnar to compel arbitration, which is included in their motion to dismiss, be **GRANTED.**

### _NOTICE_

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or proposed findings or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14)*

**days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.**

**Failure to file a timely objection shall constitute a waiver of the right to _de novo_ review by the district court and to appeal the district court's order.**

Dated this 14th day of September, 2010.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge